IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ZACHARY ROYAL
a minor child, by and through his
father and legal guardian, RAYMOND
ROYAL et al.,

    Plaintiffs,

      v.

DAVID A. COOK
Commissioner of the Georgia
Department of Community Health,

    Defendant.

CIVIL ACTION FILE
NO. 1:08-CV-2930-TWT

ORDER

      This is an action seeking injunctive relief against the Georgia Department of

Community Health. It is before the Court on the Plaintiff Zachary Royal's Motion for

a Preliminary Injunction [Doc. 86] which is GRANTED.  At the evidentiary hearing

on May 3, 2012, the parties agreed that the record on the motion would constitute the

record for a determination on the merits of the case.  This Order constitutes my ruling

on the motion and my findings of fact and conclusions of law on the merits of the

case.

T:\ORDERS\08\Hunter\royalinj2.wpd

## I.  Findings of Fact

1.      Since Plaintiff Zachary Royal was 2 years old, he has received Medicaid-funded nursing services from Georgia's Department of Community Health (the "Department") and its predecessor agencies.   Under the Medicaid Act, a participating state is required to provide certain categories of care to eligible children, including early and periodic screening, diagnostic and treatment services ("EPSDT"). In Georgia, a child who is enrolled as a member of the Georgia Pediatric Program[1] is eligible to receive private duty nursing services.[2] While the Plaintiff has been enrolled in the Georgia Pediatric Program, the Department has approved him to receive private duty nursing services in his home.  Since 2003, he has been receiving 84 hours of nursing care a week in his home.

2.      On June 23, 2011, the Department notified the Plaintiff that his hours of approved skilled nursing services were being reduced from 84 to 77 hours effective July 23, 2011. Four weeks later, another reduction would go into effect, from 77 hours

---

[1]This is a Georgia Medicaid program that provides continuous skilled nursing care to medically fragile children.  It is referred to as "GAPP."

[2]Private duty nursing services is defined as "nursing services for recipients who require more individual and continuous care than is available from a visiting nurse or routinely provided by the nursing staff of the hospital or skilled nursing facility."  42 C.F.R. § 440.80.   These services are provided by a registered nurse or nurse practitioner under the direction of the recipient's physician at either the recipient's home, a hospital, or a skilled nursing facility. Id.

to 70 hours. The Notice reflected checked boxes and additional information, quoted

below:

Rationale for this decision is as follows:

☑   Skilled nursing hours may be reduced over time based on the medical need of the member and the stability of the child's condition (see GAPP Manual § 803, Letter of Understanding, Appendix L).

☑   Your child has received the same amount of nursing hours since 6/2/03.

☑   The nurses notes reviewed for the past three months document the stability of your child's condition.

☑   Your child's condition has remained stable with no exacerbations in disease process or hospitalizations since last pre-certification period.

☑   There is no evidence from the documentation submitted that the current hours are medically necessary to correct or ameliorate the child's medical condition (see 42 USCS § 1382h(b) [sic], O.C.G.A. § 49-4-169.1) and GAPP Manual § 702.2(A)).

☑   Other reason(s):
   •   Zachary's skilled care needs are identified as: total assistance with ADL's including positioning, oxygen administration when needed, Bi-Pap use at night and when ill, CPT with vest treatment, in-exsufflator use with nebulizer treatments, medication administration, and suctioning as needed. These do not require a skilled nurse.
   •   Skilled nursing care services will be reduced when the medical condition of the member stabilizes to give more of the responsibility of the care of the member to the parent(s) and or caregiver(s). One of the goals of the Georgia Pediatric Program is to teach the parents and caregivers how to care for the member in the absence of a nurse. <u>The Georgia Pediatric Program (GAPP) is not intended to be a permanent solution to skilled care. It is a teaching program.</u> (See GAPP Manual, Section 803(A)c).
   •   Non-Covered Services GAPP Services include services for individuals requiring excessive hours of nursing care for an

extended period or for an indefinite period of time (See Manual § 905(d)).

- Members served by the GAPP program are required to meet the same level of care as for admission to a hospital or nursing facility and must be Medicaid eligible. (GAPP Manual § 601(See 42 CFR § 409.31-409.34 and 42 CFR § 440.10).
- Please refer to the GAPP Policy and procedure manual for more information about the GAPP Program at: https://www.ghp.georgia.gov/wps/output/en US /public/Provider/MedicaidManuals/2010-1 GAPP v.9 pdf
- Non-Covered Services include services for back up support or respite purposes for the primary or secondary caregiver (GAPP Manual § 905 (g).
- If Zachary's health status changes, requires hospitalization, or new skilled needs are identified please have his agency contact the GAPP Nurse and update her on these changes.

(P. Ex. 10).

3.     The Plaintiff's primary treating physician is Dr. Daniel Torrez, a pediatric lung specialist.  Dr. Torrez has treated Zachary for his underlying condition since the fall of 2010. Previously, Zachary was a patient of Dr. Teague, a professor at Emory University. Dr. Torrez impressed me as a very competent and caring physician.  At the evidentiary hearing, he testified that the underlying condition Zachary has is called Werdnig-Hoffman Disease, or SMA type 1. SMA is spinal muscular atrophy, a genetic disorder that affects a part of the nervous system controlling voluntary muscles and muscle function. (T. Tx. p. 49).  It is a progressive disease. Commonly, patients with SMA type 1 die in early childhood, by age 2 years. (T. Tx p. 51).

4.      SMA affects the respiratory muscles very significantly. (T. Tx. p. 49). It is difficult to breathe normally, to be able to get the air in and out of the lungs. (T. Tx. p. 50). When Dr. Torrez first began seeing him, Zachary had been using for years non-invasive ventilation through BiPAP, a bi-level pressure support. (T. Tx. p. 54). He has a hard time being able to keep his lungs inflated, leading to problems with his oxygen and carbon dioxide levels. (T. Tx. p. 50, 53). The settings on the BiPAP have been increased because of the results of his sleep studies showed that he was having "obstructive events where he was trying to breathe but not being able to breathe adequately." (T. Tx. p. 54). The settings now used provide a "significant" level of support. His need for support in breathing is expected to increase as his condition worsens.

5.      Zachary has had issues fighting infections and when he was much younger he required frequent hospitalizations. (T. Tx. p. 50). Dr. Torrez testified that, with technology and knowing more about the disease, "we are able to intervene and help them out with a variety of modalities to help them fight infections, hopefully to be able to stay at home and not come into the hospital as often as sometimes they do." (T. Tx. p. 50). It is unusual for a patient with Zachary's disease not to have needed to come into the hospital more frequently. (T. Tx. p. 52). Dr. Torrez attributes Zachary's ability to stay out of the hospital in part to the good care that he has received at home.

(T. Tx. p. 52).  Patients who do not have good care at home come into the hospital more frequently with respiratory complications. (T. Tx. p. 52).

6.     Dr. Torrez opined that patients like Zachary need 24-hour, seven-day-a-week care from a licensed nurse, based upon "what we know about his medical condition and the care that's involved in taking care of these patients." (T. Tx. p. 53, 58-59).  His letter of medical necessity states that Zachary needs "at least" 84 hours per week of skilled nursing care. (Plaintiff's Exhibit 2).  If hospitalized, Zachary would be admitted to the intensive care unit or technology dependent intensive care unit, where the staffing ratio is 1 nurse for 2 patients, because that is the level of care required of patients such as Zachary. (T. Tx. p. 55).  Zachary's condition has recently deteriorated.  (T. Tx. p. 53-54).  Dr. Torrez testified that Zachary will not get better and will just get worse. (T. Tx. p. 55).

7.     Zachary's mother died five years ago.  Until her death, she was Zachary's primary caregiver.  (T. Tx. p. 5).  Kathleen Tondee, Zachary's primary licensed practical nurse, has been providing care to him for more than 16 years. She testified by Declaration and at trial. Ms. Tondee testified that Zachary's nurses work 12 hours each day, 7 days a week, typically from 7 am to 7 pm. The nurses perform head – to – toe assessments of Zachary's body systems at the beginning and end of each 12 hour shift. Zachary is also assessed throughout the day as the nurses are providing care,

observing, and interacting with him. Ms. Tondee testified that these assessments require the use of nursing judgment followed up with appropriate intervention. The nurses practice "aspiration precautions" while caring for Zachary, especially during mealtimes when the risk of aspiration is greatest. The point of "aspiration precautions" is to prevent aspiration. (T. Tx. p. 45).  The fact that Zachary did not aspirate while aspiration precautions were being implemented means that they were successful. Signs of aspiration would be breath sounds that were adverse, rhonchi or rales, difficulty breathing, desaturation, and fever. (T. Tx. p. 35).  Ms. Tondee testified that she did not think that Mr. Royal is competent to recognize the breath sounds. She believes that he could potentially learn the mechanics, the technique, but not making the judgment that this is something that needs to be addressed now. (T. Tx. p. 35). Mr. Royal testified that he is unable to do deep suctioning on Zachary because it causes Zachary pain and he might injure Zachary's lungs.  (T. Tx. p. 8-9).

8.     Ms. Tondee provides total nursing care to Zachary, including care management, to access resources for him, obtain supplies, make doctor's appointments, among other things. (T. Tx. p. 25).  Zachary does not have a case manager and Ms. Tondee is not aware of any case management that he could have. (T. Tx. p. 26).  Zachary travels to doctor's appointments in a handicap-accessible van in which Zachary's wheelchair can be secured. His father drives, and Ms. Tondee travels

with Zachary to provide him with care during the trip. She does so without any compensation, signing out of work when she goes with them. (T. Tx. p. 26).  Ms. Tondee attends appointments to obtain information so that she can explain what the doctor is saying to Zachary's father, who doesn't understand everything that the doctor is saying. (T. Tx. p. 27).

9.     Previously, the Department and GMCF required nursing providers to complete a 13 page nursing assessment by the nursing agency provider on a document identified as "Appendix K" and also provide a separate letter of medical necessity from the child's physician to explain the medical necessity of the nursing care ordered by the physician. In Spring 2011, the Department and GMCF replaced Appendix K and the physician's letter of medical necessity with a one page document  identified as "Appendix I, Medical Necessity/Level of Care Statement Admission or Continued Stay."  Ms. Collins testified that although it was no longer required by GMCF, nothing actually prevents a physician from sending a letter of medical necessity along with the Appendix I.  (T. Tx. p. 83-84).  The physician, primary caregiver and nursing agency provider sign to "attest that the above information is accurate and this member meets Pediatric Level of Care Criteria and requires skilled nursing care that is ordinarily provided in a nursing facility or other institutional setting." (Plaintiff's

Exhibit 11 at I-1).  Dr. Torrez's letter of medical necessity was provided to GMCF as part of the administrative review of the reduction in hours. (Plaintiff's Exhibit 2).

10.     On or about April 1, 2003, DCH contracted with the Georgia Medical Care Foundation ("GMCF") to perform reviews and determine, among other things, the eligibility and medical necessity of GAPP members.  GMCF's medical review team is composed of the medical director, a licensed pediatric neurologist, and nurses. Karis Morneau is a registered nurse employed by GMCF to review the documentation provided in the GAPP packets to determine the number of hours of skilled nursing would be approved for a child under the GAPP program. Ms. Morneau has been a nurse for 18 years and has worked in pediatric home care, in a pediatric physician's practice, and in hospital environments.  Ms. Morneau testified that there was no set number that GMCF was looking to reduce Zachary's hours to. It depends on each review period. "We were looking to go just an hour a day to start off to see if he does well with that." If he doesn't then the agency sends in another packet through a change request. If he's had a hospitalization, if they see that he is not tolerating being weaned down to 10 hours a day, an exacerbation that's requiring new skilled nursing needs, more teaching for the father, then, of course, we would review him again.  (T. Tx. p. 100-109).  Ms. Morneau's opinions concerning the care needed by Zachary are

entitled to little weight compared to that of Dr. Torrez and the Defendant's reliance upon her to show that Zachary is "stable" is unreasonable.

11.     Dr. Gary Miller is employed by GMCF as the medical director of medical management services. He practiced neurology and pediatric neurology for 25 years before closing his practice to work full time for GMCF. He has oversight of all Medicaid review activities in all areas, including the GAPP program. He does some of the GAPP reviews, primarily the reconsiderations or appeals that come in. (T. Tx. p. 123).  In performing GAPP reviews, Dr. Miller has access to all of the medical history and information that is in GMCF's system, including all previous GAPP submissions, any request for an inpatient hospital stay, certain radiology procedures that might have been done, if it has required peer review from GMCF.  (T. Tx. p. 125).

12.     Dr. Rosenfeld, who did not testify, was the physician reviewer for the initial determination of reduction in hours. (T. Tx. p. 128).  Dr. Miller did not have any formal orientation to the GAPP program when he assumed responsibility as medical director in 2007. He learned about the program from being with the nurses and Dr. Rosenfeld. There have always been periodic meetings between Department staff and GMCF staff and a monthly joint meeting with staff from GMCF, the Department, and the private GAPP provider agencies. (T. Tx. p. 129).

13.     Dr. Miller testified that "obviously the care that he has gotten has prevented many of the complications that you often see with spinal muscular atrophy." (T. Tx. p. 138).  Dr. Miller further testified that "nursing care doesn't influence the progression of the neurological disease. There is no treatment for spinal muscular atrophy and skilled nursing services are not going to affect the underlying progression of his neuromuscular disease."  (T. Tx. p. 138-9).  Dr. Miller has never met Zachary Royal. He does not recall looking at anything other than Dr. Torrez's letter and some nursing notes on his review of the previous decision to reduce hours. (T. Tx. p. 139). The length of time that the child has been in the program matters because they would have the expectation that his caregiver would have been taught and be able to assume some of his care at home. (T. Tx. p. 140).

14.     Miriam Henderson was employed as a program specialist at the Department of Community Health from 1998 until 2010. (T. Tx. p. 60). She was responsible for policy under the GAPP program after GMCF took over responsibility for case management in 2003. (T. Tx. p. 60-61). The GAPP program provided skilled nursing services to medically fragile children on a continuous basis. GAPP was a teaching program to train parents how to take care of their children in the absence of a nurse. (T. Tx. p. 72)  One thing that GAPP required was that a child could not leave the hospital without training the parent how to care for the child in the absence of a

nurse. Children in the GAPP program were supposed to have two caregivers. Many parents did not have a secondary caregiver. When GMCF began assuming responsibility for GAPP, there were meetings between the Department and the medical director and nurses from GMCF. The meeting minutes reflect what was discussed at the meetings and identify follow up issues. Plaintiff's Exhibit 16 discussed "Review Guidelines" for the program. These Guidelines include tapering schedules. Nursing hours were to be reduced following the suggested schedule. The Guidelines directed that all cases will eventually be tapered. The Guidelines state that the goal of the tapering schedules is that all cases will eventually be weaned off the program if possible. For children seeking renewals where there was no change in condition, GMCF was to either decrease skilled nursing hours or keep them at the same level. The Guidelines provided that GMCF could assign 50 hours of skilled nursing hours per week for 6 months if one parent works and the secondary back-up caregiver is home. If both parents work or if one parent works and the secondary back up caregiver is not in the home, GMCF can assign 56 hours of skilled nursing for 6 months. According to the renewal guidelines, the goal is to decrease skilled nursing to 40 hours per week or less and eventually wean the child off the program if possible. In the August 2005 GAPP meeting, the medical directors of DCH and GMCF discussed the need to contact physicians to retrain them on the GAPP program goal

of weaning the children off the program once the parents are trained caregivers. (Plaintiff's Exhibit 17).  In the April 2006 GAPP meeting, GMCF's medical director Dr. Rosenfeld requested information on the weaning goals of the program. DCH stated that the goal of the program was to wean down to only needed hours but not to wean off the program unless no skilled needs "due to EPSDT requirements." Dr. Rosenfeld indicated that weaning education is needed for physicians, providers and hospital discharge planners as it appears that there is a conflict of interest since physicians want to make money for business reasons, therefore, children are not weaned when they possibly could be. Dr. Rosenfeld believed this to be the case because he had bowed to pressure to keep a patient's family happy. Also discussed was the requirement that each child must have a secondary caregiver, and if no secondary caregiver is available, then GMCF was to notify the legal staff at DCH. (Plaintiff's Exhibit 18).  In the June 2006 GAPP meeting, DCH clarified that the overall program goal is "to wean down to the needed hours but not wean off the program unless no skilled needs are identified." (Plaintiff's Exhibit 19).

15.    The Plaintiff introduced GAPP meeting minutes from 2003 through 2006.  At the GAPP meeting in April 2003, DCH discussed the transition of the GAPP program from DCH to GMCF.  The weekly GAPP Medical Review Team meetings were discussed.  The nurses on the team complete a case document review

and then make recommendations to the medical director.  Final decisions of the team are a group process.  Also discussed was the importance of maintaining the weaning schedule.  (Plaintiff's Exhibit 15).  In the June, 2003 GAPP meeting, DCH and GMCF discussed "Review Guidelines" for the program. These Guidelines included tapering schedules. Nursing hours were to be reduced following the suggested schedule.  The Guidelines directed that all cases will eventually be tapered.  The Guidelines state the goal of the tapering schedules is that all cases will eventually be weaned off the program if possible. For children seeking renewals of nursing hours where there was no change in condition, GMCF was to either decrease skilled nursing hours or keep skilled nursing hours at the same level.  The Guidelines provided that GMCF could assign 50 hours of skilled nursing per week for 6 months if one parent is working and one parent is home.  If both parents work or one parent works and the secondary back-up caregiver is not in the home, GMCF can assign 56 hours of skilled nursing per week for 6 months.  According to the renewal guidelines, the goal is to decrease skilled nursing to 40 hours per week or less and eventually wean the child off of the program if possible.  (Plaintiff's Exhibit 16).  In the August, 2005 GAPP meeting, the medical directors of DCH and GMCF discussed the need to contact physicians to retrain them on the GAPP program goal of weaning the children off of the program once the parents are trained caregivers.  (Plaintiff's Exhibit 17).  In the

April, 2006 GAPP meeting, GMCF's medical director, Dr. Rosenfeld, requested information on the weaning goals of the program.  DCH stated the goal of the program is to wean down to only needed hours but not to wean off program unless no skilled needs "due to EPSDT requirements."  Dr. Rosenfeld indicated that weaning education is needed for physicians, providers, and hospital discharge planners as it appears that there is a conflict of interest since physicians want to maintain good relationships with the parents and the providers want to make money for business reasons, therefore, children are not weaned when they possibly could be.  Dr. Rosenfeld believed this to be the case because he had bowed to pressure to keep a patient's family happy.  Also discussed was the requirement that each child must have a secondary caregiver, and if no secondary caregiver is available, GMCF was to notify the legal staff at DCH. (Plaintiff's Exhibit 18). In the June, 2006 GAPP meeting, DCH clarified the overall program goal "to wean down the needed hours but not wean off the program unless no skilled needs are identified." (Plaintiff's Exhibit 19).

16.    GAPP has a policy manual.  The GAPP manual is updated every four months. The version of the GAPP manual in effect at time of the decision to reduce Zachary's nursing hours was entitled "PART II, POLICIES AND PROCEDURES FOR THE GEORGIA PEDIATRIC PROGRAM (GAPP)," and dated July 1, 2011. (Plaintiff's Exhibit 11).  GAPP policy requires that a cost analysis should be made to

determine that the cost of caring for the child in the home and community is below the cost of providing the same care in an institution. (Plaintiff's Exhibit 11, § 701).  GAPP policies require the primary caregiver to assist with the child's care in the home. (Plaintiff's Exhibit 11, §702.2(B)).   The child must have available primary and secondary caregivers to actively participate in her care.   (Plaintiff's Exhibit 11, §702.2(C)).  The child must need a specified time-limited period of daily continued nursing care, supervision and monitoring.  Hours of nursing may be reduced based upon an evaluation of the current medical plan of treatment, updated physician summaries, provider agency documented current assessments and nursing care. (Plaintiff's Exhibit 11, §702.2(D)). GAPP provides that skilled nursing care services will be reduced when the medical condition of the child stabilizes to give more of the responsibility of the care of the child to the parents or caregivers.  One of the goals of the GAPP program is to teach the parents and caregivers how to care for the member in the absence of a nurse.  GAPP is not intended to be a permanent solution to skilled care.  It is a teaching program. (Plaintiff's Exhibit 11, § 803A(c)).

17.    Dr. Torrez's opinion as to medically necessary hours of skilled nursing care is entitled to much greater weight than that of Dr. Miller or Dr. Rosenfeld. Dr. Miller reviewed his case on one occasion and based his decision upon summaries of his records.  He did not review Zachary's actual medical records.

18.     Reducing his skilled nursing care by 10 hours a week would deprive Zachary of essential services necessary to maintain his life and health.  Raymond Royal cannot assume another 1.4 hours per day of unassisted care for Zachary.  In June 2011, he was doing all that she could do to care for Zachary.  If the nursing hours were reduced, Raymond Royal would have to retire or quit his job.  (T. Tx. p. 6).  If Raymond Royal quits his job and cannot support Zachary, the child would be institutionalized.  (T. Tx. p. 6).

## II.  Conclusions of Law

Congress enacted the Medicaid Act in 1965 with the aim of providing medical care for the nation's poorest and most vulnerable people.  Medicaid is a cooperative venture of the state and federal governments through which states that elect to participate receive federal financial assistance to furnish medical assistance to eligible people with low incomes.  The law that I will apply in this case is set out in the opinion of the Court of Appeals for the Eleventh Circuit in Moore ex rel. Moore v. Reese, 637 F.3d 1220 (11th Cir. 2011) ("Moore II").  I will not repeat the lengthy discussion of the Medicaid Act and Regulations and the history of the EPSDT program.  And I will not repeat the discussion of the court precedents.

Near the end of the opinion, the Court of Appeals summarized the guiding principles to be applied to a case such this.  They are as follows: (1) Georgia is

required to provide private duty nursing services to [Zachary Royal], who meets the EPSDT eligibility requirements, when such services are medically necessary to correct or ameliorate his illness and condition.  (2) A state Medicaid plan must include reasonable standards for determining eligibility for and the extent of medical assistance—here, the extent of private duty nursing services for [Zachary Royal]—and such standards must be consistent with the objectives of the Medicaid Act, specifically its EPSDT program.  (3) A state may adopt a definition of medical necessity that places limits on a physician's discretion. A state may also limit required Medicaid services based upon its judgment of degree of medical necessity so long as such limitations do not discriminate on the basis of the kind of medical condition. Furthermore, a state may establish standards for individual physicians to use in determining what services are appropriate in a particular case and a treating physician is required to operate within such reasonable limitations as the state may impose.  (4) The treating physician assumes the primary responsibility of determining what treatment should be made available to his patients.  Both the treating physician and the state have roles to play, however, and a private physician's word on medical necessity is not dispositive.  (5) A state may establish the amount, duration, and scope of private duty nursing services provided under the required EPSDT benefit.  The state is not required to provide medically unnecessary, albeit desirable, EPSDT services.

However, a state's provision of a required EPSDT benefit, such as private duty nursing services, must be sufficient in amount, duration, and scope to reasonably achieve its purpose.  (6) A state may place appropriate limits on a service based on such criteria as medical necessity. In so doing, a state can review the medical necessity of treatment prescribed by a doctor on a case-by-case basis, and may present its own evidence of medical necessity in disputes between the state and Medicaid patients.  Id. at 1255. The Court of Appeals concluded:

> So, the pivotal issue is only whether 84 hours are sufficient in amount to reasonably achieve the purposes of private duty nursing services to correct or ameliorate Moore's condition. In this regard, the inquiry hinges on whether DCH -- in exercising its ability to "place appropriate limits on a service based on such criteria as medical necessity," --fulfilled or breached its concomitant duty to ensure that Moore's private duty nursing care is "sufficient in amount, duration, and scope to reasonably achieve its purpose."

Id. at 1257-58.

Under the Americans with Disabilities Act, a public entity may not discriminate against qualified individuals based on a disability.  42 U. S. C. § 12132.  "A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d).  The Supreme Court has construed the ADA's integration mandate and concluded that the discrimination forbidden under Title II of the ADA includes "unjustified institutional isolation" of the disabled.  Olmstead v. L.C. ex rel. Zimring,

527 U.S. 581, 600 (1999).   "Thus, under *Olmstead* and the applicable ADA regulations, when treatment professionals have determined that community placement is appropriate for disabled individuals, those individuals do not oppose the placement, and the provision of services would not constitute a 'fundamental alteration,' states are required to place those individuals in community settings rather than institutions. Fisher v. Oklahoma Health Care Authority, 335 F.3d 1175, 1181 (10th Cir. 2003).  The Plaintiff may succeed on his ADA claim if the Defendant's action places him at a "high risk" of premature entry into institutional isolation.  Id. at 1185.

The Plaintiff has met his burden to establish by a preponderance of the evidence that 84 private duty nursing hours are medically necessary. First, the evidence is undisputed that Zachary is a medically fragile child who requires skilled care 24 hours a day 7 days a week. Zachary has a degenerative condition that significantly impairs him and has gotten worse in the last year. The testimony of Dr. Torrez and the other evidence presented at trial establish that Zachary is chronically unstable, and that is why he needs the degree of skilled nursing care that Dr. Torrez has recommended.  I do not find credible the testimony of Ms. Morneau and Dr. Miller that Zachary's condition is stable. Second, Dr. Torrez's opinion as to medical necessity is more persuasive and is entitled to much greater weight than that of Dr. Miller or Ms. Morneau. Dr. Torrez is Zachary's treating physician. He has based his opinion as to

medical necessity for skilled nursing for Zachary upon his examination of Zachary, his knowledge of Zachary and his medical history and condition, and the progression of Zachary's condition. Neither Ms. Morneau nor Dr. Miller has ever met Zachary. Neither witness provided any evidence that Zachary's condition had improved nor any evidence about any increase in the ability of Zachary's father to provide skilled care that would justify reducing his hours.  In making the decision to reduce Zachary's nursing hours, the Defendant completely ignored Dr. Torrez's letter of July 8, 2011. Third, I am convinced that the real reason for reducing Zachary's nursing care hours was not due to an individualized determination of medical necessity but due to the policy and practice of Defendant's GAPP program to wean nursing care and to shift more of the burden of skilled care to his parent caregiver over time. Application of that policy to Zachary was unreasonable because his condition was not improving and his father's competency to provide skilled care had not increased. The reduction in hours was arbitrary and capricious and was not based upon medical necessity.  Fourth, the reduction in nursing hours places Zachary at high risk of premature entry into institutional isolation.  In conclusion, Defendant's reduction of Zachary's nursing hours from 84 hours to 77 hours and finally to 70 hours per week are not sufficient in amount to reasonably achieve the purposes of correcting or ameliorating Zachary's condition.  Georgia has breached its duty to ensure that Zachary's private duty nursing

care is sufficient in amount, duration, and scope to reasonably achieve its purpose. Therefore, the Plaintiff is entitled to relief on his claim for violation of the Medicaid Act.  He has also shown that the Defendant has discriminated against him in violation of the Americans with Disabilities Act.

A plaintiff seeking a permanent injunction must demonstrate (1) that he has suffered an irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction. Angel Flight of Georgia, Inc. v. Angel Flight America, Inc., 522 F.3d 1200, 1208 (11th Cir. 2008). A significant reduction in nursing hours for Zachary Royal would put his health and life at risk. If Defendant Cook were permitted to proceed with his decision to significantly reduce Zachary's nursing hours, Zachary would be irreparably harmed. The balance of the harms favors the Plaintiff; and it is in the public interest for Zachary to continue to live at home with his father rather than be institutionalized at public expense.  Therefore, the Plaintiff is entitled to a permanent injunction prohibiting the Defendant from reducing his hours of skilled nursing care until further Order of this Court.

### III.  Conclusion

For the reasons set forth above, the Plaintiff Royal's Motion for a Preliminary Injunction [Doc. 86] is GRANTED.  On the merits of his Medicaid Act and ADA claims, the Plaintiff is entitled to permanent injunctive relief and a declaratory judgment prohibiting the Defendant from reducing his nursing hours according to the terms of the Final Determination dated August 3, 2011.

SO ORDERED, this 15 day of June, 2012.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge