IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MARKETRIC HUNTER
a minor child, by and through his
mother and legal guardian, Thelma
Lynah, et al.,

    Plaintiffs,

      v.

    CIVIL ACTION FILE
    NO. 1:08-CV-2930-TWT

DAVID A. COOK
Commissioner of the Georgia
Department of Community Health,

    Defendant.

## OPINION AND ORDER

This is an action in which severely disabled children are seeking injunctive relief against the Georgia Department of Community Health. This Opinion and Order constitutes the findings of fact and conclusions of law following a bench trial held in this matter from September 3, 2013, through September 5, 2013. Because the Defendant's determinations with respect to the Plaintiffs Hunter and Eaves were not based upon medical necessity, the Plaintiffs are entitled to injunctive relief.

I.  Findings of Fact

A.    Plaintiff R.E.

1.    Plaintiff R.E. is a 16 year old girl residing with her parents and two siblings in Atlanta, Georgia.  (T. Tx. p. 51).[1]

2.    R.E. has been receiving Medicaid-funded nursing services from Georgia's Department of Community Health ("the Department").  Under the Medicaid Act, a participating state is required to provide certain categories of care to eligible children, including early and periodic screening, diagnostic and treatment services ("EPSDT").  In Georgia, a child who is enrolled as a member of the Georgia Pediatric Program[2] is eligible to receive private duty nursing services.[3] While the Plaintiff has been enrolled in the Georgia Pediatric Program, the Department has approved her to receive private duty nursing services in her home.

---

[1] Citations to the trial transcript will be indicated as "(T. Tx. p. )."

[2] This is a Georgia Medicaid program that provides continuous skilled nursing care to medically fragile children.  It is referred to as "GAPP."

[3] Private duty nursing services is defined as "nursing services for beneficiaries who require more individual and continuous care than is available from a visiting nurse or routinely provided by the nursing staff of the hospital or skilled nursing facility."  42 C.F.R. § 440.80.  These services are provided by a registered nurse or nurse practitioner under the direction of the recipient's physician at either the recipient's home, a hospital, or a skilled nursing facility.  Id.

3.      Dr. Elizabeth LeDuc is R.E.'s treating pediatrician.  She has been treating R.E. since November 2011 and has been practicing medicine since 1990.  (T. Tx. pp. 12-13).

4.      According to Dr. LeDuc, R.E. suffers from cerebral palsy and spastic quadriplegia due to severe prenatal brain damage.   R.E. is confined to a wheelchair for most of each day and her arms and legs need to be locked into position in the wheelchair.  (T. Tx. pp. 15-16).

5.      R.E.'s quadriplegia limits the functioning of her respiratory system. Because she cannot handle her own respiratory secretions, she requires suctioning and oxygen throughout the day and night.  She also suffers from chronic aspiration, meaning that secretions from her respiratory system back up into her respiratory tree and cause pneumonia and other infections.  R.E. additionally suffers from chronic rhinitis and hypothyroidism, which cause inflammation and prevent her from controlling her own body temperature.  (T. Tx. pp. 15-16).

6.      R.E. has gastroesophageal reflux disease (GERD), obstructive sleep apnea, and dysphagia, which prevents her from swallowing.   Because of her conditions, she is fed through a jejunostomy tube, or J-tube, which is installed in the middle part of her small intestine.  (T. Tx. pp. 16-17).

7.     Dr. LeDuc stated that R.E.'s most severe health problem is her seizure disorder.  R.E. is constantly seizing, has been hospitalized on multiple occasions for seizures, and has severe aspirations from seizures, which can lead to pneumonia.  (T. Tx. p. 17).

8.     R.E. has limited vision, is severely developmentally delayed, and cannot speak.  (T. Tx. pp. 17-18).

9.     According to Dr. LeDuc, R.E.'s conditions are permanent.  They will not improve and may become more complicated as R.E. continues to grow.  (T. Tx. p. 19).

10.     R.E. has been hospitalized five times since January 2013.  She was in the hospital on January 7-12, 2013, for seizures, pneumonia, hypothermia, and hypotension.  She was hospitalized on February 19, 2013, at Children's Hospital of Atlanta due to status epilepticus – a seizure that lasts over five minutes.  She remained in the hospital until March 4, 2013.  She returned to the hospital from March 10 through March 13 for shock and respiratory failure following a pattern of seizures and aspirations.  Likewise, she was in the hospital on April 23 when her seizures and breathing problems led to life-threatening septic shock.  She was not discharged until May.  R.E. was hospitalized again in June so she could receive dental care.  Dr. LeDuc testified that R.E. often goes to the emergency room when Dr. LeDuc's office is

closed for medication adjustments and evaluations of urinary or swelling problems or minor seizures.  (T. Tx. pp. 25-32).  These recent hospitalizations are evidence that R.E. is not receiving all of the skilled nursing care that she needs.

11.     Dr. LeDuc testified that every trip to the hospital is potentially dangerous for R.E.  She stated that "every trip you take to the hospital you increase your risk of infection because hospitals are in general not the place you want to be to avoid infection."  (T. Tx. p. 32).

12.     Dr. LeDuc stated that her "biggest goal and hope for [R.E.] is to keep her out of the hospital whether it's the emergency room or the ICU or just a regular hospital bed, keep her at home with her family with skilled nursing care around the clock."  (T. Tx. p. 32).

13.     Dr. LeDuc's opinion is that R.E. requires 24 hours of skilled nursing care every day.  (T. Tx. p. 34).  Dr. LeDuc stated that anything less than 24 hours of skilled nursing care "would be like wearing your seatbelt for part of your trip and then taking it off for an hour … and hoping everything went well."  (Id. at 37).

14.     R.E. is currently receiving 60 hours per week of skilled nursing care through GAPP.  (T. Tx. p. 36).

15.     Dr. LeDuc opines that R.E.'s mother is unable to adequately provide all the care that R.E. needs outside the GAPP provided hours.  Although R.E.'s mother

has learned how to do many of the nursing tasks that R.E. needs, she is not a nurse. Dr. LeDuc does not believe that R.E's mother is able to provide adequate nursing assessments or exercise proper nursing judgment.  Dr. LeDuc opines that at all times R.E. is in need of such nursing assessments and judgment.  (T. Tx. pp. 35-37).

16.    Dr. LeDuc further opined that even if R.E.'s mother was a skilled nurse, she could not personally provide the 108 hours of care per week that she is now required to provide to R.E.  (T. Tx. pp. 37-38).

17.    If the Department continues to only provide 60 hours of skilled nursing care, and R.E.'s mother continues to shoulder the rest of the burden of caring for R.E., it is only a matter of time before R.E. returns to the hospital and possibly dies.  (T. Tx. pp. 39-40).

18.    Dr. LeDuc's assessment that R.E. requires 24 hours of skilled nursing care every day is based on her assessment of what is medically necessary for R.E.  (T. Tx. p. 49).

19.    Dr. LeDuc requested 84 hours of skilled nursing care per week for R.E. in a November 2011 letter.  She also signed a form acknowledging the letter generated by the nursing agency stating that R.E. would be provided with 60 hours of nursing per week.  (T. Tx. pp. 42, 46).  However, Dr. LeDuc only agreed with the 60 hours per week form because she was "concerned [R.E.] wouldn't get any care if I didn't sign

the form." (Id. at p. 46).  Although she signed the nursing form for 60 hours per week, and only requested 84 hours per week, she "couldn't believe what the amount of work that [R.E.'s mother] was being required to do.  I thought it was ludicrous.  I thought [R.E.] needed 24 hours a day of skilled nursing care." (Id. at 47).  Dr. LeDuc stated she only submitted the request for 84 hours "[b]ecause I was hoping she'd get at least 84." (Id. at 49).

20.    Michelle Eaves is R.E.'s mother.  She is employed full time as a schoolteacher and provides the primary income for her family.  She has three children, the oldest of whom is the Plaintiff R.E.  Michelle Eaves weighs 97 pounds and R.E. weighs 86 pounds.  (T. Tx. p. 51).   R.E.'s condition requires that Ms. Eaves pick up and move R.E. frequently, which is difficult given her weight and stiff limbs.  (Id. at 38-39).

21.    Ms. Eaves has at times become overwhelmed with her responsibilities taking care of R.E.  Ms. Eaves has been forced to remove R.E.'s oxygen alarm, which beeps loudly when R.E.'s oxygen levels fall below a certain threshold because she-- Ms. Eaves--needed sleep.  She has likewise given up holding a CPAP machine mask, which treats obstructive sleep apnea, over R.E.'s face during the night in order to get some sleep.  (T. Tx. pp. 51-52).

22.    Ms. Eaves has considered seeking institutional care for R.E.  She stated that she considered seeking an institution because "it was getting to be too much. I was exhausted.  I was--even though I learned the techniques of how to take care of her, I felt like my skills weren't adequate enough and it was too many skills to do all at one time. I'm a teacher, and I'm a mother, but I'm not a nurse."  (T. Tx. p. 54).

23.    After R.E. started getting skin breakdown in the intensive care unit at the hospital, Ms. Eaves stopped seeking an institution for R.E.  She stated that "if that was going to happen under that type of care there's no way that she would get that kind of care at an institution, not that quality.  I just felt like that she would not be better off, she would start getting skin breakdown.  And not only that, she would be away from her mom and her brother and sister."  (T. Tx. p. 55).

24.    Ms. Eaves has signed papers acknowledging GAPP's weaning policy. Ms. Eaves signed a Letter of Understanding stating that the "GAPP program is designed to teach me on the care of my child's medical condition.  I also understand that services will be reduced over time based on the medical needs of my child (the member)."  (Def.'s Ex. 26, at 1).  The letter stated that "[s]killed nursing hours will be reduced over time based on the medical needs of my child the member."  (Id.)  Ms. Eaves testified that she believed she would not receive GAPP services if she did not sign the Letter of Understanding.  (T. Tx. pp. 67-68).

25.     Ms. Eaves has been taught many of the skilled nursing tasks performed by R.E.'s skilled nurses.  Ms. Eaves does not feel that she does them well.  She was only taught the skills in isolation.  (T. Tx. pp. 63-64).

26.     The Department denied R.E.'s request for 84 hours of skilled nursing care per week.  On June 28, 2011, the Department sent Ms. Eaves a letter stating that "Your child has been denied additional services.  Your child's hours have been temporarily increased due to her recent hospitalization.  Your approved hours are 60 hours per week until the end of your current certification which ends on 10-13-11. Your request for an increase to 84 hours per week has been denied." (Pl.'s Ex. 38, at 1).  R.E. had only received 40 hours of skilled nursing care per week before this.  (T. Tx. p. 70).

27.   The denial letter included further justification for limiting the skilled nursing care hours R.E. received:

> There is no evidence from the documentation submitted that the current hours are medically necessary to correct or ameliorate the child's medical condition (See 42 USCS § 1382h(b), O.C.G.A. § 49-4-169.1) and GAPP Manual § 702.2(A)).
> • Although, [sic] your child is having seizures having skilled nursing will not prevent their duration or intensity nor will it prevent them from occurring.
> Other reason(s):
> • J-tubes are not so inherently complex to require a professional licensed person on a daily basis.  This does not require GAPP nursing hours which require continuous skilled nursing care or skilled nursing care in shifts (GAPP Manual § 601) and it does not

meet medical necessity and require the level or care provided in a nursing facility or hospital (See 42 CFR § 409-31-409.34 and 42 CFR § 440.10).

- While your child was hospitalized for increased seizures and hypoxia from 5-7-11 to 5-11-11, there are no additional/new skilled nursing needs required for this condition. Although she requires suctioning and 02 administration PRN, these are not new skilled needs and can be performed by the caregivers when the nurse is absent.

- Although Rachel is requiring continuous JT feeds rather than BID, both caregivers are documented as "competent" in tube feedings on the caregiver skills checklist submitted with the GAPP packet. Rachel's J-tube is not a new skilled need.

- Skilled nursing hours cannot be granted for projected potential problems. It is to provide for the current skilled need of the child.

(Pl.'s Ex. 38, at 2). The Defendant presented no expert physician testimony at trial that this denial was based upon medical necessity.

B.   Plaintiff Marketric Hunter

28.   Plaintiff Marketric Hunter ("Marketric") is a 12 year old Medicaid beneficiary who receives skilled nursing care through the Department. (T. Tx. pp. 78-79). Like Plaintiff R.E., Marketric is enrolled as a member of GAPP, and the state provides nursing services to Marketric under EPSDT.

29.   Marketric suffered a near drowning at 18 months of age which caused severe brain damage. As a result, he has spastic quadraplegia. (T. Tx. p. 79).

30.   Marketric has a severe seizure disorder that is difficult to control even with multiple medications. (T. Tx. p. 79).

31.     Dr. Francisco Javier Herran was Marketric's treating physician from 2009 through 2012.  (T. Tx. p. 77).

32.     Dr. Herran testified that Marketric's near drowning had further negative effects: "He also had some damage to his lungs during this event and had some restrictive lung disease and reactive airway disease.  Not only that, but he becomes very fragile in his bones because he doesn't move; so the calcium doesn't get to the bones."  (T. Tx. p. 79).  When he fractures a bone, he may have a fat embolism and can suddenly die.  (T. Tx. p. 93).  While the reactive disease causes inflammation, it is less severe and may be reversible.  Marketric's restrictive lung disease is permanent. (T. Tx. pp. 79-81).

33.     Because of his lung ailments, Marketric requires secretion suctioning every one to two hours.  He also needs to periodically wear a chest vest that mobilizes secretions by vibrating him slightly.  This treatment can cause a collapsed lung if not applied and observed properly.  He has to be moved frequently to ensure proper secretion and to avoid ulcers on his skin, even during the nighttime.  He additionally needs to use oxygen at night.  Because of the lack of muscle tone in his lungs and because of these conditions, Marketric is prone to infections, recurring bronchitis, and recurring pneumonias.  (T. Tx. pp. 81, 84; 124-26).

34.     Marketric is unable to swallow properly and is fed through a G-tube.  He accumulates secretions because he is unable to swallow.  He has a high risk of bronchoaspiration.  He also has GERD, but that has been somewhat reduced in severity by two surgical procedures.  (T. Tx. p. 82).

35.     Developmentally, Marketric is only about six months old.  According to Dr. Herran, Marketric "can recognize the mother's smile, can interact with her, … can perceive certain things, and [] will benefit from interaction with [his] mother but [is] really dependent completely on other people for survival."  (T. Tx. pp. 87-88).

36.     Dr. Herran believes that due to Marketric's multiple complex systems problems, he is in need of constant skilled nursing care.  Dr. Herran is concerned that Marketric's mother cannot fully take care of him due to her age and due to her emotional attachment to him as his mother.  (T. Tx. pp. 78-91).

37.     Dr. Herran opines that, based on medical necessity, Marketric needs at least 18 hours of skilled nursing care per day.  However, Dr. Herran believes this amount will rise as Marketric grows.  (T. Tx. p. 93).

38.     Dr. Herran stated that Marketric's conditions will not improve: "the brain damage he sustained I don't think that's going to change.  The seizure disorder he has is not going to change.  The fact that he's unable to care for himself and growing and becoming more difficult to move, that's not going to change."   (T. Tx. p. 93).

39.     Michelle McQueen is a licensed practical nurse.  She has been a nurse for Marketric for roughly eight years.  She currently has Marketric as a patient from Monday through Thursday each week.  (T. Tx. pp. 123-24).

40.     During her typical ten-hour shift taking care of Marketric, Ms. McQueen performs many duties.  She begins with a total assessment of Marketric.  She checks his respiratory system and makes sure it is clear.  She then checks his cardiac functions, and then checks his skin for ulcers, breakdowns, and edema.  She also ensures he is not experiencing any pain.  Marketric usually needs the congestion in his chest treated at the start of McQueen's shift.  (T. Tx. pp. 124-26).

41.     Ms. McQueen also oversees applying braces to Marketric's legs. Because his bones are so brittle, Marketric needs to wear special braces on his legs and stay still for five hours a day in the hopes of strengthening his bones.  Ms. McQueen applies the braces every day, and Marketric will need them for the rest of his life.  If the braces are applied incorrectly, they can cause sores and even injuries. (T. Tx. pp. 127-28).

42.     Ms. McQueen feeds Marketric through his G-tube which requires verifying the tube is inserted into his abdomen properly, checking for any residual buildup, and then using a syringe to pour formula into the tube.  She also gives him

medication through the G-tube.  Marketric receives regular medications at 8:00 a.m.,

noon, 2:00 p.m., 4:00 p.m., 8:00 p.m., 9:00 p.m., and midnight.  (T. Tx. pp. 129-30).

43.    Ms. McQueen also has to provide Marketric with breakthrough

medication when he has a seizure between regular medication doses.  It can be hard

to tell whether Marketric is having a seizure because he has difficulty controlling his

muscles and is often shaking anyway.  According to Ms. McQueen, "someone [who]

is not trained to know what a seizure looks like [] would think he is having a seizure

24 hours a day."  (T. Tx. p. 131).  Ms. McQueen is trained to recognize Marketric's

seizures.  When "he is having a seizure is usually he will clamp down, his mouth will

clamp, his eyes will roll into the back of his head, and you would really see restrictive

movements that he is really into a seizure.  And it usually takes him anywhere

between 18 seconds, sometimes to a minute to come out of it." (Id. p. 131).  Marketric

sometimes has four seizures a day, and they can be triggered by something on the TV

or even a personal interaction.  (Id. p. 132).

44.    Based on the type of seizure Marketric is having--he has grand mal and

petite mal seizures of varying lengths--Marketric needs specific medications.  Ms.

McQueen keeps a seizure log of Marketric's seizure activity and will give him the

appropriate medication.  Additionally, his seizures often cause a lot of secretion

buildup in his throat area and he will have to be suctioned.  Ms. McQueen stated it is

difficult to tell whether he has had fluid buildup in his throat after a seizure because he breathes inconsistently anyway.  (T. Tx. pp. 133-34).

45.    Ms. McQueen understands why Marketric's mother prefers not to perform suctioning on him.  "[Marketric] really puts a fright on his face when you do that to him, and I can only imagine a mom thinking she might be hurting her child when you are trying to really help him.  And he really--sometimes you have to be very careful because he can gag real bad when you do that.  So you have to know how far to go down his throat and not cause, you know, him to even just vomit while you are trying to suction him." (T. Tx. p. 134).  Improper suctioning can also cause bleeding and even a heart attack. (Id.)  Ms. McQueen performs suctioning on Marketric at least two times a day, when he is healthy, and more frequently when Marketric is sick.  (Id. pp. 147-48).

46.    Ms. McQueen keeps extensive logs on the medication Marketric takes, his behavior, his symptoms, his food and water intake, and his secretions.  (T. Tx. pp. 134-35).

47.    Thelma Lynah is Marketric's 73 year-old adoptive mother.  She adopted him after he had been abandoned to hospice care.  She takes care of him when there is no skilled nurse.  Although she has acknowledged that she can perform many if not most of the tasks that a skilled nurse performs to take care of Marketric, she is not

comfortable performing suctioning.  (T. Tx. pp. 149, 159-62).  As noted, Dr. Herran

thinks that Ms. Lynah's aversion to performing suctioning on Marketric is reasonable,

and Dr. Herran believes that Marketric's mother is not equipped physically or

emotionally to tend to Marketric's ongoing care needs.  (T. Tx. pp. 88, 91).

48.    On April 16, 2009, Ms. Lynah received a letter from the Department

notifying her of a reduction in skilled nursing hours provided to Marketric.  The letter

stated that:

> The need for services is based on medical necessity, taking into
> consideration the overall medical condition of the member, the
> equipment and the level of frequency of care required for the member,
> and whether the services will correct or ameliorate the child's
> condition… the number of hours for which approval will be granted is
> based on specific medical treatment needs of the member confirmed by
> available medical information and the documented training needs of the
> primary caregiver confirmed by an established teaching plan.  Hours may
> be reduced on an evaluation of the current medical plan of treatment
> (physician orders); updated physician summaries; provider agency
> documented current assessments and nursing care… the GAPP Manual
> states it is "the expectation that the primary caregiver(s) will become
> competent to assume some responsibility for the care of the child."

(Pl's. Ex. 18).  The letter noted that this Court had required the Department to provide

skilled nursing care at specific levels for a three month period following a surgical

procedure.  The letter stated that:

> based on the GHP evaluation, your child's skilled nursing hours are
> going to be reduced from 84 to 77 hours a week for one month and then
> from 77 hours a week to 70 hours a week for two months effective 30

days from the date of this letter.  The reason(s) for this decision is as follows:

> Skilled nursing hours may be reduced over time based on the medical need of the member and the stability of the child's condition … as evidenced by:
> * The physician's letter submitted in the last pre-certification packet stated, "Marketric  has had no hospitalization this certification period. He continues to do well."
> * Marketric's primary and secondary caregiver are both competent to perform all skilled needs per the documentation submitted by the nursing agency.
>
> Your child's condition has remained stable with no exacerbations in disease process or hospitalizations since the last pre-certification period as evidenced by physician and agency documentation submitted.  The sixty (60) day summary by the nursing agency stated the following:
> * "During our last supervisory visit, Marketric was doing well at home.  He has recovered nicely from his rod placement. He did have a hospitalization in November and December but seems to be getting back to baseline now. He is once again able to tolerate sitting up in his wheelchair.  He will be using the stander once he receives his new one.  While we visited his vital signs were stable."
> …
> There is no evidence from the documentation submitted that the current hours are medically necessary to correct or ameliorate the child's medical condition.

(Pl.'s Ex. 18).

    C.    GAPP Policies

49.    Dr. Joseph Rosenfeld was the medical director at GMCF for the GAPP

program.  During his six years at GMCF, Dr. Rosenfeld met with the medical review

team approximately once a week.  The medical review team would meet for two to

two-and-a-half hours each week and discuss 20 to 30 medical requests.  (T. Tx. p. 171).

50.     Dr. Rosenfeld stated during his tenure the GMCF began requiring "that the parents or caregivers would be taught skilled nursing care for their child so that the number of hours awarded to a child would slowly decrease based on upon the ability of the parents and the stability of the child."  (T. Tx. p. 172).

51.     Sandy Choate was the manager of medical review for the GMCF.  She testified that skilled nursing involves the overall management of the patient, assessments of the patients, planning of care for the patient, emergency management, medication illustration, and extensive charting.  (T. Tx. pp. 184-86).

52.     Ms. Choate testified that constant nursing care for 12 or more hours a day would eventually fatigue the caretaker and impair attentiveness and decision-making. The fatigue would worsen if the caretaker does not have days off in between long shifts.  (T. Tx. pp. 210-12).

53.     Catherine Ivy was the Deputy Director of Medicaid in Georgia until the start of 2013.  She began managing the GAPP program in 2010.  According to her, GAPP is primarily a teaching program for parents and the assumption is that the parents of GAPP participants will become more adept at managing the care needs of their children.  (T. Tx. pp. 229-35).  She stated that "the GAPP program was designed

really with two things in mind.  The first was to maximize the child's capacity, and the second was to maximize the parent's understanding and capacity to provide for the child's needs… it is primarily a teaching program for the parent and caregivers." (Id. pp. 231-32).

54.     Dr. Gary Miller is the Medical Director at the Georgia Medical Care Foundation ("GMCF").  Dr. Miller practiced medicine for 25 years and is board certified in pediatrics and pediatric neurology.  GMCF has managed the GAPP program since 2003.  Dr. Miller oversees the interactions between GMCF and the Department.  According to Dr. Miller, two pediatricians perform most of the reviews of requests for nursing care under the GAPP program.  (T. Tx. pp. 240-41).

55.     GMCF considers the competency of the parent when determining the amount of skilled nursing hours due to a GAPP participant.  GAPP expects parents to assume some of the child's care.  GMCF does not consider family or social schedules when determining the number of skilled nursing hours due to a child in GAPP care.  However, the competency and ability of parents to provide care is factored into determining what is medically necessary for the GAPP participants.  Dr. Miller acknowledges that trained and experienced professionals need to perform the assessment of children with complex medical conditions.  (T. Tx. pp. 270-78).

56.     GAPP reviews the nursing notes provided by the nurses when

determining whether to increase, decrease, or maintain skilled nursing hours. These notes do not necessarily incorporate the child's conditions when only a parent/caregiver is taking care of the child. (T. Tx. pp. 276-77).

57.    Karis Morneau is the pediatric team lead at GMCF. She has worked for GMCF for almost five years and previously worked as a GAPP review nurse. (T. Tx. pp. 283-86). Ms. Morneau described the GAPP review process. The decisions about GAPP nursing hours are made as a team and the physician on the team makes the final decision. The team reviews the nursing notes, the current level of skilled nursing hours, physician's letters, and hospital records when making its decision. (T. Tx. pp. 288-90).

58.    Ms. Morneau participated in the reviews of both R.E.'s and Marketric's requests for skilled nursing care. Although Ms. Morneau testified that lay people cannot practice nursing and that the practice of nursing involves an understanding of its theoretical underpinnings and applying them to real-world situation, she testified that the only skilled nursing need for both Marketric and R.E. is a nurse's full body assessment. (T. Tx. pp. 290, 300, 302, 305, 307-10). This assertion is not credible because it leads to the implausible conclusion that R.E. and Marketric each need only seven to eight hours of skilled nursing care per week during which nurses can perform assessments.

59.     The following three findings were established at the permanent injunction hearing for the  Plaintiff Zachary Royal.  On or about April 1, 2003, DCH contracted with the Georgia Medical Care Foundation ("GMCF") to perform reviews and determine, among other things, the eligibility and medical necessity of GAPP members.  GMCF's medical review team is composed of the medical director, a licensed pediatric neurologist, and nurses.  Karis Morneau is a registered nurse employed by GMCF to review the documentation provided in the GAPP packets to determine the number of hours of skilled nursing would be approved for a child under the GAPP program. Ms. Morneau has been a nurse for 18 years and has worked in pediatric home care, in a pediatric physician's practice, and in hospital environments.

60.     When GMCF began assuming responsibility for GAPP, there were meetings between the Department and the medical director and nurses from GMCF. The meeting minutes reflect what was discussed at the meetings and identify follow up issues. The "Review Guidelines" for the program include tapering schedules. Nursing hours were to be reduced following the suggested schedule. Dr. Rosenfeld indicated that weaning education is needed for physicians, providers and hospital discharge planners as it appears that there is a conflict of interest since physicians want to make money for business reasons, therefore, children are not weaned when

they possibly could be.  Dr. Rosenfeld believed this to be the case because he had bowed to pressure to keep a patient's family happy.

61.    The Plaintiff introduced GAPP meeting minutes from 2003 through 2006.  At the GAPP meeting in April 2003, DCH discussed the transition of the GAPP program from DCH to GMCF.  The weekly GAPP Medical Review Team meetings were discussed.  The nurses on the team complete a case document review and then make recommendations to the medical director.  Final decisions of the team are a group process.  Also discussed was the importance of maintaining the weaning schedule.  (Plaintiff Royal's Exhibit 15).  In the June 2003 GAPP meeting, DCH and GMCF discussed "Review Guidelines" for the program. These Guidelines included tapering schedules. Nursing hours were to be reduced following the suggested schedule.  The Guidelines directed that all cases will eventually be tapered.  The Guidelines state the goal of the tapering schedules is that all cases will eventually be weaned off the program if possible. For children seeking renewals of nursing hours where there was no change in condition, GMCF was to either decrease skilled nursing hours or keep skilled nursing hours at the same level.  The Guidelines provided that GMCF could assign 50 hours of skilled nursing per week for 6 months if one parent is working and one parent is home.  If both parents work or one parent works and the secondary back-up caregiver is not in the home, GMCF can assign 56 hours of skilled

nursing per week for 6 months.  According to the renewal guidelines, the goal is to decrease skilled nursing to 40 hours per week or less and eventually wean the child off of the program if possible.  (Plaintiff Royal's Exhibit 16).  In the August 2005 GAPP meeting, the medical directors of DCH and GMCF discussed the need to contact physicians to retrain them on the GAPP program goal of weaning the children off of the program once the parents are trained caregivers.  (Plaintiff Royal's Exhibit 17).  In the April 2006 GAPP meeting, GMCF's medical director, Dr. Rosenfeld, requested information on the weaning goals of the program.  DCH stated the goal of the program is to wean down to only needed hours but not to wean off program unless no skilled needs "due to EPSDT requirements."  Also discussed was the requirement that each child must have a secondary caregiver, and if no secondary caregiver is available, GMCF was to notify the legal staff at DCH.  (Plaintiff Royal's Exhibit 18). In the June 2006 GAPP meeting, DCH clarified the overall program goal "to wean down the needed hours but not wean off the program unless no skilled needs are identified." (Plaintiff Royal's Exhibit 19).

62.    GAPP has a policy manual.  The relevant manual, published April 1, 2011, is entitled "PART II, POLICIES AND PROCEDURES FOR THE GEORGIA PEDIATRIC PROGRAM (GAPP)."  (Pl.'s Ex. 78).  GAPP policy requires that a cost analysis should be made to determine that the cost of caring for the child in the home

and community is below the cost of providing the same care in an institution. (Id. §
701).  GAPP policies require the primary caregiver to assist with the child's care in
the home. (Id. §702.1(B)).  The child must have available primary and secondary
caregivers to actively participate in her care.  (Id. §702.1(C)).  The child must need a
specified time-limited period of daily continued nursing care, supervision and
monitoring.  Hours of nursing may be reduced based upon an evaluation of the current
medical plan of treatment, updated physician summaries, provider agency documented
current assessments and nursing care.  (Id. §702.1(D)). GAPP provides that skilled
nursing care services will be reduced when the medical condition of the child
stabilizes to give more of the responsibility of the care of the child to the parents or
caregivers.  One of the goals of the GAPP program is to teach the parents and
caregivers how to care for the member in the absence of a nurse.  GAPP is not
intended to be a permanent solution to skilled care.  It is a teaching program. (Id. §
803A(c)).

63.    Dr. LeDuc's testimony on the number of skilled nursing hours that R.E.
requires deserves more weight than the assessment of GAPP.  GAPP reviews
documentation submitted by nursing agencies in an administrative setting, and
GAPP's determination was not made by a treating physician.  The Defendant
presented no medical testimony at trial to dispute the testimony of Dr.  LeDuc.  The

Defendant presented no medical testimony at trial that the proposed reduction in skilled nursing hours was based upon medical necessity.

64.    Likewise, Dr. Herran's testimony on the number of skilled nursing hours that Marketric needs deserves more weight than the assessment of GAPP. The Defendant presented no medical testimony at trial to dispute the testimony of Dr. Herran. The Defendant presented no medical testimony at trial that the proposed reduction in skilled nursing hours was based upon medical necessity.

## II. Conclusion of Law

Congress enacted the Medicaid Act in 1965 with the aim of providing medical care for the nation's poorest and most vulnerable people. Medicaid is a cooperative venture of the state and federal governments through which states that elect to participate receive federal financial assistance to furnish medical assistance to eligible people with low incomes. The Eleventh Circuit summarized the guiding principles to be applied in a case like this in Moore ex rel. Moore v. Reese, 637 F.3d 1220 (11th Cir. 2011) ("Moore II"). Those principles are as follows:  (1) Georgia is required to provide private duty nursing services to the Plaintiffs, who meet the EPSDT eligibility requirements, when such services are medically necessary to correct or ameliorate their  illnesses and conditions.  (2) A state Medicaid plan must include reasonable standards for determining eligibility for and the extent of medical assistance--here, the

extent of private duty nursing services for the Plaintiffs--and such standards must be consistent with the objectives of the Medicaid Act, specifically its EPSDT program. (3) A state may adopt a definition of medical necessity that places limits on a physician's discretion. A state may also limit required Medicaid services based upon its judgment of degree of medical necessity so long as such limitations do not discriminate on the basis of the kind of medical condition. Furthermore, a state may establish standards for individual physicians to use in determining what services are appropriate in a particular case and a treating physician is required to operate within such reasonable limitations as the state may impose. (4) The treating physician assumes the primary responsibility of determining what treatment should be made available to his patients. Both the treating physician and the state have roles to play, however, and a private physician's word on medical necessity is not dispositive. (5) A state may establish the amount, duration, and scope of private duty nursing services provided under the required EPSDT benefit. The state is not required to provide medically unnecessary, albeit desirable, EPSDT services. However, a state's provision of a required EPSDT benefit, such as private duty nursing services, must be sufficient in amount, duration, and scope to reasonably achieve its purpose. (6) A state may place appropriate limits on a service based on such criteria as medical necessity. In so doing, a state can review the medical necessity of treatment prescribed by a doctor on

a case-by-case basis, and may present its own evidence of medical necessity in disputes between the state and Medicaid patients.  Id. at 1255.  The Court of Appeals concluded:

> So, the pivotal issue is only whether 84 hours are sufficient in amount to reasonably achieve the purposes of private duty nursing services to correct or ameliorate [the Plaintiff's] condition. In this regard, the inquiry hinges on whether [the Department] -- in exercising its ability to "place appropriate limits on a service based on such criteria as medical necessity," --fulfilled or breached its concomitant duty to ensure that [the Plaintiff's] private duty nursing care is "sufficient in amount, duration, and scope to reasonably achieve its purpose."

Id. at 1257-58.  Applying these principles to this case, the Court concludes that Plaintiff R.E. has met her burden to establish by a preponderance of the evidence that 18 hours per day of private duty nursing care are medically necessary.  It is undisputed that R.E. is a medically fragile child.  The testimony of Dr. LeDuc establishes that R.E. is constantly at risk of hospitalization.  The testimony further establishes that R.E. is in need of skilled nursing care.  Although R.E.'s mother can perform many of the custodial tasks that a skilled nurse normally performs, her mother does not have expertise in nursing care and cannot be relied upon in emergency situations.  Given the testimony of R.E.'s treating physician and treating nurse, the Court is not convinced that the attempted reductions in R.E's skilled nursing hours is based on a determination of her medical necessity.  Rather, the reductions are due to the policy and practice of the GAPP program to wean nursing care and to arbitrarily shift more

of the burden of R.E.'s skilled care to her parent caregiver.  Dr. LeDuc stated that the current level of care provided--60 hours per week--will eventually lead to R.E. being hospitalized more frequently and eventually dying.  (T. Tx. pp. 39-40).  R.E.'s mother cannot be expected to provide more than 6 hours per day of skilled care to the child. Application of GAPP policy to R.E. to reduce her skilled nursing hours below 18 hours per day was unreasonable because her condition is not improving.  She is not stable--she is chronically unstable.  Further, the reasons listed in the Defendant's letter denying R.E.'s request for additional services were insufficient to support denying her requested level of skilled nursing care.  Although Ms. Eaves has acknowledged her ability to use the J-tube and her ability to recognize when R.E. is having a seizure, this does not preclude the need for skilled nursing.  As Dr. LeDuc stated, a skilled nurse is needed because Ms. Eaves cannot be relied upon to exercise proper nursing judgment, especially not for 108 hours per week.  The Defendant's refusal to provide even 84 hours per week of skilled nursing care was therefore arbitrary and capricious and not based on medical necessity.  The Defendant's failure to provide sufficient skilled nursing hours to R.E. breached the Defendant's duty to ensure that R.E.'s private duty nursing care is sufficient in amount, duration, and scope to reasonably achieve its purpose.

Similarly, the Plaintiffs have established by a preponderance of the evidence

that, based on medical necessity, Plaintiff Marketric Hunter requires 18 hours per day of private duty skilled nursing hours.  It is not disputed that Marketric is a medically fragile child.  He is chronically unstable.  The testimony of Dr. Herran shows that Marketric is in need of consistent care from a nursing professional.  Although Ms. Lynah, Marketric's mother, can perform some custodial duties in Marketric's care, she cannot perform deep suctioning, which Marketric often requires, and Dr. Herran is concerned about Ms. Lynah's ability to care for Marketric in an emergency.  Further, Dr. Herran testified that Ms. Lynah, who is 73 years old, has difficulty moving Marketric given his weight and his lack of control of his muscles.  Additionally, Marketric needs professional care for suctioning as well as to constantly monitor his seizure activity to ensure he is receiving the proper mediation.  Marketric's current skilled nurse provides treatments to Marketric, such as applying a vest to mobilize secretions, attaching his leg braces, and performing deep suctioning, that are complicated and potentially dangerous if mishandled.  Further, the Department's reasons for weaning Marketric from his current level of skilled nursing care--that he had been relatively stable and had not been hospitalized recently--do not establish that the lower number of hours meets the medically necessary number of hours.  The Defendant's failure to provide sufficient skilled nursing hours to Marketric breached the Defendant's duty to ensure that Marketric's private duty nursing care is sufficient

in amount, duration, and scope to reasonably achieve its purpose.

The testimony of Dr. Miller does not alter the above conclusions. Dr. Miller had not treated either of the Plaintiffs and had not even reviewed their medical records. Likewise, Karis Morneau's testimony does not alter the above conclusions because she has not treated the Plaintiffs and because her assertion that the only skilled nursing needs the Plaintiffs have are their need for a nurse to provide skilled nursing assessments was not credible. Tanya Hill's testimony that Michelle Eaves could simultaneously sleep and provide the care R.E. needs at night indefinitely was not credible.

Accordingly, the Plaintiffs have met their burden in showing that the application to the Plaintiffs of GAPP's stated policy of reducing skilled nursing hours without a change in the child's condition was unreasonable and violative of the Medicaid Act. The Department has not shown that the reductions in the skilled nursing hours provided to the Plaintiffs were based on medical necessity rather than an arbitrary and capricious reduction of hours.

The Plaintiffs have also met their burden to show that the Defendant has discriminated against them in violation of the Americans with Disabilities Act ("ADA"). Under the ADA, a public entity may not discriminate against qualified individuals based on a disability. 42 U.S.C. § 12132. "A public entity shall

administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d).  The Supreme Court has construed the ADA's integration mandate and concluded that the discrimination forbidden under Title II of the ADA includes "unjustified institutional isolation" of the disabled.  Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581, 600 (1999).  "Thus, under *Olmstead* and the applicable ADA regulations, when treatment professionals have determined that community placement is appropriate for disabled individuals, those individuals do not oppose the placement, and the provision of services would not constitute a 'fundamental alteration,' states are required to place those individuals in community settings rather than institutions." Fisher v. Oklahoma Health Care Authority, 335 F.3d 1175, 1181 (10th Cir. 2003); Pashby v. Delia, 709 F.3d 307, 322 (4th Cir. 2013) ("individuals who must enter institutions to obtain Medicaid services for which they qualify may be able to raise successful Title II [of the ADA] claims because they face a risk of institutionalization.").  The Plaintiffs may succeed on their ADA claim if the Defendant's action places them at a "high risk" of premature entry into institutional isolation. Id. at 1185.  Here, because the Defendant was not providing the medically necessary level of care, or was attempting to reduce the level of care below the medically necessary level, the Plaintiffs were at a high risk of entering an institution to receive the medical services for which they qualify.

Because they have met their burden with respect to their claims under the Medicaid Act and the ADA, the Plaintiffs are entitled to relief.  The Plaintiffs seek a permanent injunction against the Department preventing them from reducing their hours of skilled nursing care.   A plaintiff seeking a permanent injunction must demonstrate: (1) that he has suffered an irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction. Angel Flight of Georgia, Inc. v. Angel Flight America, Inc., 522 F.3d 1200, 1208 (11th Cir. 2008).  Both Plaintiffs would be irreparably harmed by reductions in skilled nursing hours below the medically necessary level of care.  The testimony showed that both Plaintiffs could die from inadequate suctioning, seizures, or frequent hospital visits leading to infections.  R.E. is currently being irreparably harmed due to the limited nursing hours she is now receiving.  Neither Plaintiff can earn relief under the Medicaid Act in the form of monetary damages.  The balance of harms analysis favors the Plaintiffs as the testimony showed it is in the best interest of the children to be treated at home with their families rather than face repeated hospitalization or even institutionalization.  The public interest is also better served by having these children live at home rather than having the public shoulder the costs

of repeated hospital visits or institutionalization.  Therefore, the Plaintiffs are entitled to permanent injunctive relief.

### III.  Conclusion

For the reasons set forth above, the Plaintiffs are GRANTED declaratory permanent injunctive.  Accordingly, the Court ORDERS as follows:

1.     The Defendant is enjoined from reducing the skilled nursing care hours provided to Plaintiff R.E. below 18 hours of skilled nursing care per day for 180 days from the date of this Order or until further Order of this Court.

2.     The Defendant is enjoined from reducing the skilled nursing care hours provided to Plaintiff Marketric Hunter below 18 hours of skilled nursing care per day for 180 days from the date of this Order or until further Order of this Court.

The Defendant's Motion to Strike [Doc. 196] is DENIED.  The Court directs the Clerk to enter judgment for Marketric Hunter and R.E. consistent with this Order.  The Court directs the Clerk to enter judgment in favor of Zachary Royal based on the permanent injunction granted in his favor.  [Doc. 113].  The Court directs the Clerk to close the case with respect to Plaintiffs J.M. and S.R. as they accepted the Defendant's offers of judgment.  [Doc. 185].

SO ORDERED, this 27 day of September, 2013.

/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge